# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**Mattachine Society of Washington, D.C.**   )
527 16th St., N.W.                               )
Washington, D.C. 20036                )

                         Plaintiff,

                              )   Case No. 1:16-cv-00773
     v.                          )
                              )
**United States Department of Justice**   )
950 Pennsylvania Avenue, N.W.        )
Washington, DC 20530                 

                         Defendant.

## COMPLAINT FOR INJUNCTIVE RELIEF
## UNDER THE FREEDOM OF INFORMATION ACT

Plaintiff, Mattachine Society of Washington, D.C. ("Mattachine Society" or "MSDC"), by and through its undersigned counsel McDermott Will & Emery LLP, brings this Complaint against Defendant United States Department of Justice ("Defendant" or "DOJ") pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *as amended*, to enjoin Defendant from improperly withholding from Plaintiff properly requested records from the DOJ.

## PRELIMINARY STATEMENT

1.      Sixty-three years ago, recently elected President Dwight D. Eisenhower signed Executive Order 10450 ("EO 10450") and, with the stroke of his pen, provided J. Edgar Hoover's Federal Bureau of Investigation ("FBI") with the legal authority to purge gay and lesbian employees from the federal employment rolls.

2.      The pretext for EO 10450 was "to insure that the employment and retention in employment of any civilian officer or employee within the department or agency is clearly consistent with the interests of the national security."  (Ex. 1, Exec. Order No. 10,450 § 2, 18 Fed.

Reg. 2,489 (Apr. 27, 1953).)  The grounds for protecting "national security," however, included

"[a]ny criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct, habitual use of

intoxicants to excess, drug addiction, *sexual perversion*."  (*Id.*) (emphasis added).

3. This provision became a "Trojan horse" which gave FBI Director Hoover the

jurisdiction to carry out a long running plan to purge homosexuals from serving in the Federal

Government.

4. Indeed, the origins of EO 10450 go back to before the election of the new President.

5. In 1950, the Senate Investigations Subcommittee issued a report, entitled

"Employment of Homosexual and Other Sex Perverts in Government" to examine the security

risks and "methods used in dealing with the problem" of homosexuals in government.  Indeed, in

its concluding section, the Report stated:  "It is the opinion of this subcommittee that those who

engage in acts of homosexuality and other perverted sex activities are unsuitable for employment

in the Federal government."  (Ex. 2, Mem. from K. Johnson to W. Irons, Re: Commission's desire

to have a discussion on suitability policy relating to homosexuals, dated Jan. 8, 1965 at 2

("Johnson-Irons Memo") (quoting Senate Subcommittee of the Committee on Expenditures in the

Executive Department report entitled "Employment of Homosexuals and other Sex Perverts in the

Government," dated Dec. 15, 1950).)  And, the Senate wanted the government to do something

about the problem.

6. In 1951, in response to the Senate's call for the government to identify and purge

the nation's employment rolls of homosexuals, FBI Director Hoover adopted what he called the

"Sex Deviate Program."

7.      Under the Sex Deviate Program, Hoover instructed all investigative employees of the FBI to ensure that any information they received during the course of background checks that concerned the employee's sexual orientation be "completely and fully developed."

8.      Hoover also conscripted local law enforcement to the cause.  In May of 1950, Hoover sent a bulletin to all local law enforcement "to place a notation on the arrest fingerprint card that the subject was an employee of the Federal Government."  Copies of these fingerprint cards were sent to the FBI, thereby providing Hoover with a ready database of federal employee arrests for, among other things, "morals charges."

9.      In other words, by the time of Eisenhower's election in November 1952, Hoover already was amassing a cache of information to use against homosexual employees of the federal government.  And he was using state and local police as his deputies to gather it.

10.      But there were limits to Hoover's power under the Sex Deviate Program.  While he could amass this information about the sexual orientation of federal employees, he lacked the authority to fire them merely based on their sexual orientation.

11.      EO 10450 changed everything.  With its adoption, the new President legalized the discharge of a federal employee on the basis of "sexual perversion."

12.      In the decades that followed, the FBI, with the aid of the United States Civil Service Commission ("CSC"), used EO 10450 to discharge thousands of employees from federal service based simply on evidence of homosexuality.  In the 1950's alone, the government terminated 7,000 to 10,000 federal employees based on suspicions of homosexuality.  (Ex. 3, U.S. Merit Systems Protection Board, "Sexual Orientation and the Federal Workplace", report to the President and Congress, May, 2014.)

3

13.     Uncovering the documents concerning the Sex Deviate Program and the
implementation of EO 10450 is one of the goals of the Mattachine Society, a non-profit,
non-partisan research and educational society that conducts original archival research at private
and public repositories across the country.  The mission of the MSDC is to uncover the often
deleted political histories of lesbian, gay, bisexual and transgender ("LGBT") Americans who
faced persecution and discrimination at the hands of federal and state governments for over
sixty-five years.

14.     For over four years, the MSDC has sought to obtain documentation concerning the
adoption and devastating implementation of EO 10450, particularly as it relates to the purging of
homosexuals from federal employment.

15.     On January 25, 2013, the MSDC submitted a request to the FBI under the FOIA,
seeking the production of "any and all internal FBI correspondence or communications regarding
Executive Order 10450 and also specifically includes, but not limited to, all files created by and
communications to or from Warren E. Burger.  The date range for this request is 1950-1990."  The
President had tasked Burger, who was then a high-ranking DOJ official, with enforcement of
EO 10450.

16.     The Government's response to the MSDC's FOIA request concerning EO 10450
has been one of delay and obfuscation.  Despite the MSDC's repeated requests for documents
created over a 40 year period, the DOJ and FBI have produced only 552 pages of documents and
withheld 583 pages of documents.

17.     As an initial matter, the volume of material that the DOJ and FBI have found does
not survive any level of scrutiny.  It defies logic to believe that only 1,135 pages concerning

4

EO 10450 were created by the government under a program that lasted 40 years and resulted in terminating the Federal employment of thousands of LGBT Americans.

18.     In addition, the DOJ and FBI's claims of privilege are indefensible.  Simply as one example, the proposition that some of the requested documents are being withheld on the basis of national security – documents presumably created decades ago – makes no sense.  More shocking is the fact that the FBI historically used the same ground of "national security" to withhold documents that it used to purge our nation's employment rolls of LGBT Americans over sixty years ago.

19.     The MSDC submitted a valid and enforceable FOIA request about an expansive government program that destroyed the lives of thousands of Americans.  Although full equality for LGBT Americans is not yet a reality, most Americans today no longer hold antiquated, prejudicial notions about LGBT Americans or believe that LGBT Americans are less than equal. And, they certainly know that LGBT Americans do not pose a security threat to the United States.

20.     Yet, after 60 years, the government is unwilling to come clean.  For the reasons set forth in this Complaint, this Court should order the DOJ and the FBI to not only release all materials currently identified about the adoption and ruthless implementation of EO 10450, but also to conduct a thorough review of their files to identify whether any additional materials concerning EO 10450 must be released pursuant to the MSDC's FOIA request.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action pursuant to 5 U.S.C. § 552(a)(4)(B).

22.     Venue in the District of Columbia is proper under 5 U.S.C. § 552(a)(4)(B).

## PARTIES

23.     The MSDC is a non-profit, non-partisan research and educational society that conducts original archival research at The National Archives, U.S. presidential libraries, the Library of Congress, the FOIA Library of the Federal Bureau of Investigation, the Stonewall National Museum and Archives, and other private and public document repositories across the country.  The mission of the MSDC is to uncover the often deleted political histories of LGBT Americans who faced persecution and discrimination at the hands of federal and state governments for over sixty-five years.  The MSDC is dedicated to achieving full civil equality for LGBT Americans.  In furtherance of these goals, the MSDC requested (and has been refused) access to records of the United States Department of Justice and the FBI.  The MSDC is located at 1527 16th St., NW, Washington, D.C. 20036.

24.     Defendant United States Department of Justice is an Agency within the meaning of 5 U.S.C. § 552(f), is subject to the requirements of the FOIA, and controls the FBI, which is a component of Defendant.  The DOJ is located at 950 Pennsylvania Avenue, NW, Washington DC 20530-0001.  Plaintiff sent its FOIA requests to the FBI and the FBI has improperly withheld the records at issue here.

## FACTUAL ALLEGATIONS

### A.  Executive Order 10450 Legalized the Discrimination of Homosexuals

25.     On April 27, 1953, under the pretext of protecting national security, President Dwight D. Eisenhower issued EO 10450, declaring that the federal government could deny a citizen employment in "each department or agency of the Government" solely because that person was homosexual.  (Ex. 1, Exec. Order No. 10,450 § 2, 18 Fed. Reg. 2,489 (Apr. 27, 1953).)

26.     EO 10450 legalized the discrimination of homosexuals.  It not only excluded homosexuals from prospective employment, it also served as the justification for government

6

agencies to reopen old "loyalty" investigations previously authorized by President Harry S.

Truman under Executive Order 9835 ("EO 9835") to determine whether current employees were

homosexual and, if so, to terminate them.

27.     In charge of enforcing EO 10450 was then-Assistant Attorney General of the

United States, and later, U.S. Supreme Court Chief Justice Warren E. Burger.  As the head of the

DOJ Civil Division from 1952-1957, Burger was tasked with carrying out the objectives of

EO 10450.

### B.   The FBI's "Sex Deviate Program" As Foundation for EO 10450

28.     At the time of Eisenhower's election in November 1952, the FBI already was

conducting "loyalty" investigations of all federal government employees, pursuant to EO 9835.

(*See* Ex. 4, Exec. Order No. 9835 §§ I, IV(1), 12 Fed. Reg. 1,935 (Mar. 25, 1947).)  Under EO

9835, the FBI could not, however, disqualify someone from federal employment based on

homosexuality.  Therefore, the FBI lacked "investigative jurisdiction" over, in the words of

then-FBI Director Hoover, "Sex Deviates."  (Ex. 5, Memo. from J. Edgar Hoover to All

Investigative Employees, dated Sept. 7, 1951.)

29.     In a September 7, 1951 memo entitled "Sex Deviates in United States Government

Service," Hoover sought to solve the FBI's problem of its lack of jurisdiction.  Hoover directed

that in the course of "Loyalty of Government Employee cases," "[w]hen information is

received . . . indicating the person under investigation is a sex deviate, this allegation should be

completely and *fully developed* and the facts reported."  *Id.* at 2 (emphasis added).  Hoover also

instructed his agents that, "when an allegation is received that a present or former civilian

employee of any branch of the United States Government is a sex deviate, such information is

furnished to the [Civil Service Commission]." *Id.* at 1. Thereby placing a "mark" on that individual's employment.

30.    Further, Hoover wrote that "[a]ll of the police departments throughout the country were notified . . . to place a notation on the arrest fingerprint card that the subject was an employee of the Federal Government" if a person was arrested for being a sex deviate. *Id.* By the time Eisenhower was elected, Hoover already had amassed a repository of information to use against homosexual employees of the Federal Government. More disturbing, Hoover called on and, in essence, "deputized" state and local departments to gather this information.

31.    Hoover used the collected information with terrifying effect. For example, with the Sex Deviate Program in full force, Hoover sought to remove one of Eisenhower's most trusted political advisors, Arthur Vandenberg, Jr. ("Vandenberg"). Vandenberg was the son of a well-known, and highly regarded, United States Senator from Michigan. Vandenberg served as the Chair of "Citizens for Eisenhower" and advised Eisenhower at the Republican convention. (*See* Ex. 6, James M. Haswell, Vandenberg Key Aide of Ike at Convention, Detroit Free Press, July 11, 1952; *see also* Ex. 6, Esther Tufty, It Was Vandenberg Day; Ex. 7, Ltr. from Dwight D. Eisenhower to Arthur Vandenberg, Jr., dated Oct. 11, 1952.) To reward Vandenberg for his efforts, on November 27, 1952, Eisenhower named Vandenberg "Secretary to the President." (Ex. 8, Russell Porter, Vandenberg Jr. Is Selected As Eisenhower's Secretary, N.Y. TIMES, Nov. 27, 1952, at 1.) Before he could serve, however, Vandenberg was subjected to a loyalty investigation by the FBI.

32.    During the investigation, the FBI learned that Vandenberg was living with a young man who had been arrested "in Lafayette Park on a morals charge." (Ex. 9, Ltr. from L.B. Nichols to Clyde Tolson, dated Dec. 9, 1952.)

33.     On December 30, 1952, during one of his first meetings with the President-elect, Hoover and Eisenhower discussed, among other things, the results of Vandenberg's investigation. In a post-meeting memorandum summarizing the meeting, Hoover noted that he "mentioned the case of Mr. Arthur Vandenberg and outlined briefly to the General some of the angles of the case which we are now investigating."  (Ex. 10, Mem. from J. Edgar Hoover to Clyde Tolson et al., dated Jan. 5, 1953 ("Tolson Memo").)  The "angle," of course, was Vandenberg's homosexuality.

34.     The Tolson Memo further states that Hoover "told the General that Vandenberg had asked that we not interview the young man at present living with Vandenberg until he, Vandenberg, came out of the hospital, to which he had gone for a physical check over the last weekend." (Tolson Memo, at 2).  Eisenhower was thus provided with information to conclude that Vandenberg was, in fact, homosexual.

35.     This information presented Eisenhower with a unique problem.  The President-elect's inner circle included a homosexual, yet there was no legal authority to terminate a known homosexual who was "loyal" and not a security risk.  Furthermore, even admitting a sex deviate was a close friend would be a political disaster at the outset of a new administration. Rather than reveal Vandenberg's homosexuality, therefore, Eisenhower told Hoover that, if Vandenberg withdrew from his appointment, Hoover "could inform Vandenberg that no report would be submitted as it would then be a moot question." *Id.*

36.     Instead of having his sexual orientation made public, Vandenberg resigned under the guise of being "ill." (Ex. 11, Ltr. from Arthur Vandenberg, Jr. to Dwight D. Eisenhower, dated Jan. 13, 1953.)  In a letter replying to Vandenberg's letter, Eisenhower said that he was "very distressed" about Vandenberg's "health" and informed Vandenberg that "as I know you

understand, we have to go ahead with our setup." (Ex. 12, Ltr. from Dwight D. Eisenhower to Arthur Vandenberg, Jr., dated Jan. 17, 1953.)

37.     Three weeks later, Vandenberg wrote back, informing Eisenhower that he was "ready and anxious to go to work." (Ex. 13, Ltr. from Arthur Vandenberg, Jr. to Dwight D. Eisenhower, dated Feb. 6, 1953.) But Eisenhower was not prepared to have a homosexual in the White House. He ignored Vandenberg's request, pretending that Vandenberg remained ill.

38.     The myth persisted in the press as well. On or about April 14, 1953, The New York Times reported that Vandenberg requested Eisenhower withdraw his appointment because "he had been suffering from stomach ulcers and did not know how long the ailment would continue." (Ex. 14, Vandenberg Forgoes U.S. Post, N.Y. TIMES, Apr. 14, 1953, at 38.)

### C. President Eisenhower Issues EO 10450, Using the Sex Deviate Program to Purge Homosexuals from Government

39.     In the spring of 1953, sixty-three years ago today, Eisenhower issued EO 10450. The pretext for EO 10450 was "to insure that the employment and retention in employment of any civilian officer or employee within the department or agency is clearly consistent with the interests of the national security." (Ex. 1, Exec. Order No. 10,450 § 2, 18 Fed. Reg. 2,489 (Apr. 27, 1953).)

40.     Section 8(1)(iii) of EO 10450 stated, in relevant part, that:

> The investigations conducted pursuant to this order shall be designed to develop information as to whether the employment or retention in employment in the Federal service of the person being investigated is clearly consistent with the interests of the national security. Such information shall relate, but shall not be limited, to . . . [a]ny criminal, infamous, dishonest, *immoral, or notoriously disgraceful conduct*, habitual use of intoxicants to excess, drug addiction, *sexual perversion*.

*Id*. § 8(1)(iii) (emphasis added).

41.     EO 10450 also leveraged the collection of arrest finger print cards collected through Hoover's Sex Deviate Program. *Id.* § 3(a) ("[I]n no event shall the investigation include less than a national agency check (including a check of the fingerprint files of the [FBI]) . . . .").

42.     The stated rationale of EO 10450 – "national security" – was, in many ways, pretext.  EO 10450 was a ruse designed to purge the government of certain types of people, including homosexuals.  In an article dated February 24, 1954, The New York Times reported that of 590 people separated from the State Department, "[n]inety-nine involved 'homosexual deviations' as the principal factor, and 278 similar cases were under investigation with no determinations yet made."  (Ex. 15, New U.S. Jobs Went to Half Of State Department 'Risks', N.Y. TIMES, Feb. 24, 1954 at 1, 42.)

43.     In short, the government used EO 10450 repeatedly to discriminate against homosexuals in the workplace and set an example that the States would soon follow.

44.     The animus embedded in EO 10450 – that homosexuals were not fit for employment in the Federal government – filtered throughout government agencies and, importantly, the United States Civil Service Commission.  It, in essence, gave tacit permission to the CSC to implement its own measures to purge homosexuals from federal employment.

45.     In 1956, the CSC issued a "Suitability Rating Examiners Handbook," instructing its examiners on how to evaluate whether an individual's sexual orientation barred government employment.  (Ex. 2, Johnson-Irons Memo, at 3.)  "Proof" of homosexuality included "credible information from reliable sources concerning an individual's reputation and conduct."  *Id.*

46.     The Handbook also provided guidelines for "processing" cases of previously debarred homosexual employees.  In those cases, "a careful and thorough examination must be made to determine whether complete rehabilitation has been effected."  *Id.*  Evidence of

11

"rehabilitation" from "sexual deviation" included "severance of association with persons known or suspected of being sexual deviates," "discontinuing the frequenting of places known to be 'hangouts' or residences of sexual deviates," and "the attitude and reputation of the person since corrective action was taken." *Id.* But to remove any doubt, the Handbook stated, "[p]ersons about whom there is evidence that they are homosexuals or sexual perverts . . . *are not suitable for Federal employment.*" *Id.* at 2 (emphasis added).

47.    The exclusion of homosexuals from federal employment continued through the 1960s.  In a memorandum to John Steele, Glenn Stahl wrote that the "[CSC] set[s] homosexuality apart from other forms of immoral conduct and take[s] a much more severe attitude toward it." (Ex. 16, Mem. from John W. Steele to O. Glenn Stahl, dated Nov. 17, 1964 ("Steele Memo") at 2.) When it came to other acts of "immoral conduct," the CSC would take into account the seriousness of the conduct.  Not the case for homosexuality:  the CSC would "automatically find the individual [that has engaged in homosexual acts] unsuitable for Federal employment *unless there is evidence of rehabilitation.*" *Id.* (emphasis in original).

48.    This led to subjective determinations of an individual's suitability "depending on the strength of the reviewing official's personal aversion  to homosexuality," with some examiners concluding "once a homo,  always a homo":

> Really, we do not apply Commission policy at all; *we apply our own individual emotional reactions and moral standards.*  Our tendency to 'lean over backwards' to rule against a homosexual is simply a manifestation of the revulsion which homosexuality inspires in the normal person.  What it boils down to is that most men look upon *homosexuality as something uniquely nasty, not just as a form of immorality*.

*Id.* at 3 (emphasis added).

49.     Less than a year later, representatives of the CSC met with members of the MSDC to discuss the federal government's policy on the suitability of persons "who are shown to have engaged in homosexual acts." (Ex. 17, Ltr. from John Macy to MSDC, dated Feb. 25, 1966.)

50.     In its official response, the CSC used language of disgust and animus to justify the exclusion of homosexuals from government employment:

> Pertinent considerations here are the *revulsion of other employees* by homosexual conduct and the consequent disruption of service efficiency, the *apprehension caused other employees* of homosexual advances, solicitations, or assaults, *the unavoidable subjection of the sexual deviate* to erotic stimulation through on-the-job use of common toilet, shower, and living facilities, the *offense to members of the public who are required to deal with a known or admitted sexual deviate* to transact Government business, the hazard that the prestige and authority of a Government position will be used to foster homosexual activity, particularity among the youth, and the use of Government funds and authority in furtherance of conduct offensive both to the mores and the law of our society.

*Id.* at 2 (emphasis added).

51.     "To be sure," the letter concluded, "if an individual applicant were to publicly proclaim that he engages in homosexual conduct, that he prefers such relationships, that he is not sick, or emotionally disturbed, and that he simply has different sexual preferences . . . the Commission would be required to find such an individual unsuitable for Federal employment." *Id.* at 4.

52.     Multiple documents uncovered by the MSDC refer to this letter as the CSC's "official policy" on the employment of homosexuals.

### D.  The Mattachine Society's FOIA Request

53.     The MSDC's goal is to uncover documents concerning EO 10450 as a way to educate the public and preserve this important chapter in the history of the LGBT community.

54.     On or about January 25, 2013, the MSDC submitted a FOIA request (Ex. 18, the "Request") to the FBI seeking the production of documents concerning EO 10450 dated from January 1, 1950 through December 31, 1990.  In addition to this request, the MSDC also specifically sought all files in the FBI's possession created by and communications to or from Warren Burger concerning EO 10450.

55.     For more than two years, the MSDC's request was met with silence from the Federal Government.  After this seemingly interminable delay, on April 17, 2015, the FBI responded to the Request stating that "539 pages were reviewed and 253 pages are being released." (Ex. 19, Ltr. from D. Hardy, dated Apr. 17, 2015 (the "FBI Letter").)

56.     The FBI claimed that certain documents should not be disclosed because they were protected from disclosure by other federal statutes (*see* 5 U.S.C. § 552(b)(3) (citing Federal Rule of Criminal Procedure 6(e) [protecting grand jury materials]) and that disclosure could reveal the identity of confidential sources (*see* 552(b)(7)(D)).  Additional pages of documents were sent to other government agencies for review.

57.     On May 5, 2015, MSDC received a letter from the Defendant DOJ, National Security Division which released approximately 45 additional pages.  The DOJ stated that it had "reviewed these records and are releasing them in part."  (Ex. 20, Ltr. from K. Tieman, dated May 5, 2015 (the "DOJ Letter").)

58.     The DOJ claimed that the following exemptions, pursuant to 5 U.S.C. § 552, justified the withholding of documents responsive to the Request:  personal privacy (§ 552(b)(6)) and personal privacy of records compiled for law enforcement purposes (§ 552(b)(7)(C)).

59.     On June 12, 2015, the MSDC appealed the determinations of the FBI and the DOJ and requested that the withheld information be released pursuant to the Request (Ex. 21, the "Appeal").

60.     On June 22, 2015, the MSDC received an additional letter from the FBI responding to the Request stating that an additional "476 pages were reviewed and 254 pages are being released."  (Ex. 22, Ltr. from D. Hardy to L. Linsky, dated June 22, 2015 (the "Second FBI Letter").)

61.     The FBI claims that the following exemptions, pursuant to 5 U.S.C. § 552, justified the withholding of documents responsive to the Request:  classified information for national security purposes (§ 552(b)(1)); grand jury materials (§ 552(b)(3) (citing 50 U.S.C. § 403g)); personal privacy of records compiled for law enforcement purposes (§ 552(b)(7)(C)); and information concerning a confidential source (§ 552(b)(7)(D)).

62.     The FBI indicated that additional documents were sent to other Government agencies for review, such as the Office of Information Policy ("OIP").  In addition, the FBI indicated that it was consulting with another agency concerning the Request.

63.     On August 13, 2015, the MSDC again appealed the determinations of the FBI and the DOJ arguing that the FBI's search was inadequate and requested that additional information be released pursuant to the Request (Ex. 23, the "Second Appeal").

64.     On September 2, 2015, the OIP sent a letter to Lisa Linsky ("Linsky"), counsel for the Mattachine Society, stating that one document, totaling six pages had been referred to the OIP by the FBI for review as to whether it could be released.  This letter states that all six pages are being withheld under Exemption 5 of FOIA, 5 U.S.C. § 552(b)(5), the "deliberative process privilege."

15

65.     On September 28, 2015, the OIP sent another letter, this time stating that 75 pages had been referred to the OIP by the FBI.  This letter states that eight more documents, totaling 32 pages were withheld under Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5), the deliberative process privilege.  The OIP further stated that the remaining 38 pages did not pertain to EO 10450 and, thus, were withheld.

66.     On October 20, 2015, the MSDC appealed OIP's determination with respect to the documents referred to in both the September 2 Letter and the September 28 Letter, requested that the OIP reconsider its application of the claimed exemption, and that the appeal be consolidated with the prior Appeal to streamline the administrative process.

67.     On February 25, 2016, DOJ denied the MSDC's outstanding appeals.  (*See* Ex. 24, Ltr. from S. O'Neill to L. Linsky, dated Feb. 25, 2016.)  DOJ explained that the Initial Request ("IR") Staff "properly withheld 38 pages in full because they are protected from disclosure under the FOIA pursuant to 5 U.S.C. § 552(b)(5), the deliberative process privilege.  This provision concerns certain inter- and intra-agency records protected by the deliberative process privilege and the attorney client privilege."  *Id*.  The response also explained that the MSDC was not entitled to itemizations of each withheld document.  Lastly, the DOJ found that the IR Staff "properly determined that 38 additional pages are not responsive to your client's request."  *Id*.

68.     MSDC comes now for relief under 5 U.S.C. § 552(a)(4)(B) to appeal Defendant's response (including all of the responses to the MSDC's appeals as discussed above) its FOIA requests.

## COUNT I

69.     Plaintiff MSDC incorporates herein by reference all of the allegations contained in paragraphs 1 through 68.

16

70.     FOIA provides that "[o]n complaint, the district court of the United States . . . in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."  5 U.S.C. § 552(a)(4)(B), *amended by* OPEN Government Act of 2007, Pub. L. No. 110-175, 121 Stat. 2524.

71.     On or about February 25, 2016, Defendant DOJ affirmed the determinations of the IR Staff thereby making its action final.  The DOJ went on to state that if the MSDC is "dissatisfied with my action on your appeal, the FOIA permits your client to file a lawsuit in federal district court in accordance with 5 U.S.C. § 552(a)(4)(B).

72.     Defendant DOJ has failed to conduct an adequate search for the agency records relating to Executive Order 10450.

73.     Plaintiff has exhausted the applicable administrative remedies with respect to Defendant DOJ's failure to conduct an adequate search for the requested records.

74.     On information and belief, the requested agency records have been improperly withheld in that the FOIA requires their disclosure and Defendant failed to conduct an adequate search for said agency records.

## COUNT II

75.     Plaintiff incorporates herein by reference all of the allegations contained in paragraphs 1 through 74.

76.     FOIA provides that "[o]n complaint, the district court of the United States . . . in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."  5 U.S.C. § 552(a)(4)(B), *amended by* OPEN Government Act of 2007, Pub. L. No. 110-175, 121 Stat. 2524.

77.    On or about February 25, 2016, Defendant DOJ affirmed the determinations of the IR Staff thereby making its action final.  The DOJ went on to state that if the MSDC is "dissatisfied with my action on your appeal, the FOIA permits your client to file a lawsuit in federal district court in accordance with 5 U.S.C. § 552(a)(4)(B).

78.    Defendant United States DOJ has wrongfully withheld the requested agency records pertaining to Executive Order 10450 by relying on FOIA exemptions 1, 3, 5, 6, 7(C), and 7(D).  *See* 5 U.S.C. § 552(b)(1) (classified information for national security purposes); 5 U.S.C. § 552(b)(3) (grand jury materials); 5 U.S.C. § 552(b)(5) (the deliberative process privilege); 5 U.S.C. § 552(b)(6) (personal privacy), 5 U.S.C. § 552(b)(7)(C) (personal privacy of records compiled for law enforcement purposes); and 5 U.S.C. § 552(b)(7)(D) (information concerning a confidential source).

79.    Plaintiff has exhausted the applicable administrative remedies with respect to Defendant DOJ's wrongful withholding of the requested records.

80.    On information and belief, the requested agency records have been improperly withheld in that the FOIA requires their disclosure and they do not fall within any of FOIA's exemptions from required disclosure, including but not limited to those exemptions cited by Defendant.

WHEREFORE, Plaintiff MSDC requests that this Court:

(1)    Order Defendant DOJ to conduct further searches of its agency records for documents responsive to the FOIA requests;

(2)    Order Defendant DOJ to process immediately the requested records in their entirety, including but not limited to those that have been withheld by the FBI (as detailed above);

(3)     Order Defendant DOJ, upon completion of such processing, to disclose the

requested records in their entirety and make copies available to Plaintiff MSDC;

(4)  Award Plaintiff MSDC its costs and attorneys' fees on this action; and

(5)  Award such other and further relief as the Court shall deem just and proper.

Dated:  April 27, 2016
       Washington, D.C.

Respectfully Submitted,

/s/ Joshua David Rogaczewski
Joshua D. Rogaczewski
D.C. Bar No. 490468
Paul M. Thompson
D.C. Bar No. 973977
Irene A. Firippis
D.C. Bar No. 1029548
McDermott Will & Emery LLP
The McDermott Building
500 North Capitol Street, N.W.
Washington, DC 20001
Telephone: +1 202 756 8195

*Attorneys for Plaintiff*
*Mattachine Society of Washington, D.C.*

Of Counsel:

Lisa A. Linsky (*pro hac vice application to be filed*)
Michael R. Huttenlocher (*pro hac vice application to be filed*)
Lisa Gerson (*pro hac vice application to be filed*)
Krista Meany (*pro hac vice application to be filed*)
Ashley Evans (*pro hac vice application to be filed*)
McDermott Will & Emery LLP
340 Madison Avenue
New York, New York  10173-1922
Telephone:  +1 212 547 5400